## IN THE UNTED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

IN RE:
JOSEPH L. WORRELL.
DEBTOR,

CHAPTER 13
CASE # 09-15332-EPK

---

JOSEPH L. WORRELL.
    PLAINTIFF,
VS.
EMIGRANT MORTGAGE COMPANY, INC.,
RETAINED REALTY, INC.,
    DEFENDANT.

ADVERSARY PROCEEDING
CASE NO.: 16-01046-EPK

APPELLATE CASE #
16-cv-80837-KAM

---

## NOTICE OF FILING

FEDERAL JURY VERDICT THAT APPELLEE EMIGRANT CREATED AND
PEDDLED TOXIC, "NINA", PREDATORY, ILLEGAL MORTGAGE
PRODUCT, AS IS AT ISSUE IN THIS CASE, IN VIOLATION OF FEDERAL
LAW AND IN VIOLATION OF TITLE 42 OF U.S. CONSUMER **HUMAN
RIGHTS**

---

**Submitted by**:

**Joseph Worrell, Pro Se.**
**P.O. Box 30071**
**West Palm Beach, FL 33420**

Dated: November 2, 2016

SERVICE LIST

1.
EMIGRANT MORTGAGE COMPANY, INC.,
Becker & Poliakoff, P.A.
c/o Aleida Martinez Molina, Esq.
121 Alhambra Plaza, 10th Floor,
Coral Gables, FL 33134

2.
RETAINED REALTY, INC.,
c/o Richard C. Wald, CEO
5 East 42nd St.
New York, New York 10017

# APPENDIX

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

JEAN ROBERT SAINT-JEAN,
EDITH SAINT-JEAN,
FELEX SAINTIL, YANICK SAINTIL,
BEVERLEY SMALL, JEANETTE
SMALL, LINDA COMMODORE
and FELIPE HOWELL,

          Plaintiffs,

     v.

EMIGRANT MORTGAGE COMPANY
and EMIGRANT BANK,

          Defendants.

-------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ JUN 27 2016 ★

**BROOKLYN OFFICE**

11 CV 2122 (SJ) (RLM)

## VERDICT FORM

(1)    Have Plaintiffs proven by a preponderance of the evidence that Defendant **Emigrant Bank** violated the federal Fair Housing Act and Equal Credit Opportunity Act?

    Yes  _____
    No  _____

(2)    Have Plaintiffs proven by a preponderance of the evidence that Defendant **Emigrant Bank** violated the New York City Human Rights Law?

    Yes  _____
    No  _____

(3)    Have Plaintiffs proven by a preponderance of the evidence that Defendant **Emigrant Mortgage Company** violated the federal Fair Housing Act and Equal Credit Opportunity Act?

    Yes  _____
    No  _____

**COURT EXHIBIT**

**CONTINUE TO THE NEXT PAGE**

3

(4) Have Plaintiffs proven by a preponderance of the evidence that Defendant **Emigrant Mortgage Company** violated the New York City Human Rights Law?

Yes _____
No _____

(5) Did Emigrant prove by a preponderance of the evidence that **Felex and Yanick Saintil** knowingly and voluntarily agreed to release their claims against Emigrant in their March 2010 Modification Agreement and release?

Yes _____
No _____

*If you answered "Yes" to Question 5, do not answer Question 6. Skip to Question 7.*

(6) If you answered "yes" to one or more of Questions 1 through 4, please enter the amount of compensatory damages Plaintiffs **Felex and Yanick Saintil** are entitled to as a result of Defendants' violation of the Fair Housing Act, Equal Credit Opportunity Act, and/or New York City Human Rights Law.

**Felex Saintil**            $_____

**Yanick Saintil**           $_____

(7) If you answered "yes" to one or more of Questions 1 through 4, please enter the amount of compensatory damages Plaintiffs **Jean Robert and Edith Saint-Jean** are entitled to as a result of Defendants' violation of the Fair Housing Act, Equal Credit Opportunity Act, and/or New York City Human Rights Law.

**Jean Robert Saint-Jean**   $ 180,006

**Edith Saint-Jean**         $ 180,000

(8) If you answered "yes" to one or more of Questions 1 through 4, please enter the amount of compensatory damages Plaintiffs **Beverley and Jeanette Small** are entitled to as a result of Defendants' violation of the Fair Housing Act, Equal Credit Opportunity Act, and/or New York City Human Rights Law.

**Beverley Small**           $ 70,000

**Jeanette Small**           $ 110,000

(9)  If you answered "yes" to one or more of Questions 1 through 4, please enter the amount of compensatory damages **Plaintiff Linda Commodore** is entitled to as a result of Defendants' violation of the Fair Housing Act, Equal Credit Opportunity Act, and/or New York City Human Rights Law.

**Linda Commodore**  $ __185,000__

(10)  If you answered "yes" to one or more of Questions 1 through 4, please enter the amount of compensatory damages **Plaintiff Felipe Howell** is entitled to as a result of Defendants' violation of the Fair Housing Act, Equal Credit Opportunity Act, and/or New York City Human Rights Law.

**Felipe Howell**  $ __225,000__

*IF YOU ANSWERED "YES" TO QUESTION 5 ABOVE, THEN YOU MUST NOT CONSIDER FELEX OR YANICK SAINTIL IN ANSWERING QUESTIONS 11 AND 12.*

(11)  If you find that Defendants violated the Fair Housing Act and/or the New York City Human Rights Law, do you find that punitive damages should be awarded against **Emigrant Bank**? If you find "yes," enter the amount of punitive damages you award.

Yes ____
No ✓____

Amount:  $ _____

(12)  If you find that Defendants violated the Fair Housing Act and/or the New York City Human Rights Law, do you find that punitive damages should be awarded against **Emigrant Mortgage Company**? If you find "yes," enter the amount of punitive damages you award.

Yes ____
No ✓____

Amount:  $ _____

**PLEASE SIGN AND DATE YOUR VERDICT.**

Dated: June _27_, 2016
Brooklyn, NY

_____
Signature of Foreperson

3



Home

# Groundbreaking ruling? Federal jury finds Emigrant Bank liable for predatory lending

**Plaintiffs' lawyers claim decision is first jury verdict in "reverse redlining" case**

Ben Lane
June 30, 2016

In what the plaintiffs' attorneys are calling a "first of its kind" decision, a federal jury in Brooklyn ruled this week that **Emigrant Savings Bank** and **Emigrant Mortgage Company** engaged in predatory lending by "aggressively marketing toxic mortgages to Black and Latino homeowners with poor credit" in the run-up to the housing crisis.

According to **Legal Services NYC**, which represented several aggrieved homeowners in the case, a federal jury found that Emigrant Bank violated the Fair Housing Act, Equal Credit Opportunity Act, and New York City Human Rights Law.

The decision is the first jury verdict finding a bank liable for targeting grossly unfavorable and predatory financial products to African-American and Hispanic communities, a practice known as reverse redlining, Legal Services NYC said in a release.

The plaintiffs' attorneys also said that this is the "first case where a jury had the opportunity to hold a bank accountable for predatory practices that contributed to the financial crisis in 2008."

According to Legal Services NYC, the jury awarded six plaintiffs a combined $950,000 in damages.

The decision stems from a lawsuit initially filed in 2011 by **Brooklyn Legal Services**, Legal Services NYC's Brooklyn program.

According to the plaintiffs' attorneys, between 1999 and 2008, Emigrant "targeted" minority borrowers who had poor credit but had had significant equity in their homes with a loan program called "STAR NINA." (i.e. No Income No Assets).

"Emigrant went so far as to market this product as being designed for borrowers with 'dismal' or 'scary' credit," Legal Services NYC said in a statement.

"The loans were 'no doc' loans, meaning that the bank did not examine the borrower's ability to repay the loan and Emigrant wrote the loans based on the value of people's homes," Legal Services NYC continued. "If a borrower fell behind on one payment, Emigrant imposed an automatic 18% default interest rate, forcing many to sell their homes or face foreclosure."

The plaintiffs' attorneys added that Emigrant targeted STAR NINA loans to communities of color in New York City.

According Legal Services NYC, testimony given during the trial suggested that more than 75% of Emigrant's advertising budget went to four newspapers with an "almost exclusively African-American or Hispanic" readership: Black Star, Caribbean Life, Hoy, and Mizona Hispana.

The plaintiffs' attorneys said that even when controlling for variables like credit score, income, and education levels, STAR NINA loans were 32% more likely to end up in majority African-American neighborhoods than similarly situated majority white neighborhoods.

"The combination of features to Emigrant's predatory loan product—low credit score, high equity, and an exorbitant 18% default interest rate—created a disastrous result for New York City homeowners," said Rachel Geballe, attorney at Brooklyn Legal Services.

"Too many borrowers lost their homes and their equity through Emigrant's actions; still more struggle in foreclosure today," Geballe added. "The landmark verdict this week demonstrates that banks such as Emigrant Mortgage Company can and will be held accountable for targeting minority communities with predatory financial products."

According to the plaintiffs' attorneys, Emigrant's loan program resulted in a "massive loss of equity and financial disaster" for the plaintiffs and their families, as well as the African-American and Hispanic communities that Emigrant "targeted."

The plaintiffs' attorneys also stated Emigrant was aware of the high rates of delinquency, foreclosures, and equity losses that this program created – even before the financial crisis – as more than 1 in 3 borrowers were in delinquency, which triggered the 18% default interest, but decided to continue the program in spite of those measures.

The bank continued to make these loans until the very end of 2008, when they were forced by regulators to abandon the 18% default interest rate, the plaintiff's attorneys stated.

"The evidence at trial demonstrated that the grossly unfavorable terms underlying the STAR NINA loans were buried in the loan terms and closing documents, and were never explained or highlighted to borrowers," said Tara Ramchandani, co-counsel for the plaintiffs and an attorney for **Relman, Dane & Colfax**. "This was despite Emigrant's knowledge of rising delinquencies in the product and its awareness of borrowers' shock and dismay when the 18% default interest rate went into effect."

In an extensive statement in response the verdict, Emigrant Bank states that disagrees with the decision and a number of the plaintiffs' attorneys' contentions.

The bank also said that it intends to appeal the decision.

"We respectfully disagree with the decision of the jury, which we believe is contrary to the law and the facts presented at trial," Emigrant Bank said in its statement.

"It is important to remember that this is just the first step in this process, and we will certainly appeal the decision," the bank continued. "We presented a compelling case at trial that proved our STAR NINA loan was a legal and valuable offering for borrowers with low credit scores who otherwise would have been shut out of credit markets completely. We have no doubt an appeals court will agree."

Emigrant argues that its loans were not predatory. The bank also states that it did not "target" any borrower or neighborhood, nor did it intentionally discriminate against anyone.

"The plaintiffs in this case, like nearly all borrowers in the loan program, had existing mortgages with other banks or other pending debts, and most were under the imminent threat of foreclosure if they didn't get an Emigrant loan," Emigrant said in its statement. "As the plaintiffs' own expert conceded, Emigrant loans were a "lifeline" for these consumers—which is why more than 70% of the borrowers in this program succeeded and kept their homes."

In its statement, Emigrant argues that evidence presented in the trial also showed Emigrant's history of "taking extra steps to assist its borrowers wherever possible to ensure they stayed in their homes."

According to Emigrant, it was "clear" from the evidence that Emigrant often modified loan terms and waived default interest to borrowers in need.

"It was also clear from the evidence presented at trial that each of the plaintiffs greatly benefited from their Emigrant loans when compared to any gain they would have realized from selling their homes earlier," Emigrant said.

Additionally, Emigrant said that it should be noted that STAR NINA loans were offered at interest rates "consistent with rates at the time and the risk level of the borrowers."

In fact, the majority of the plaintiffs in the case had interest rates below 10%, including as low as 8.75%, Emigrant contends.

"We are very proud of Emigrant's efforts over the years to ensure that credit is available to all the communities we serve," Emigrant said.

Civil rights advocates, quoted in the plaintiffs' release on the suit, celebrated the importance of the decision.

"The civil rights community celebrates this important victory," said Wade Henderson, president and CEO of the **Leadership Conference on Civil and Human Rights** and the **Leadership Conference Education Fund**.

"The case is historic for two reasons: it is the first case in which a jury has held a bank accountable for the predatory lending practices that led to the financial collapse; and it is the first case to prove in a court of law that minorities were targeted for unfair and deceptive loans," Henderson said. "The Brooklyn jury affirmed what civil rights advocates have long known: that reverse redlining wreaks havoc on communities of color."

Mike Calhoun, the president of the **Center for Responsible Lending**, agreed.

"As shown in this case, predatory home lenders targeted communities of color, and they devastated families and neighborhoods," Calhoun said.

"Going forward, fair and sustainable home loans are essential in order for these communities to recover from this travesty," Calhoun added. "This is the first case in which a jury, as opposed to a governmental institution, was tasked with deciding whether a bank should be held accountable for the toxic products it pushed into the marketplace while profiting on the backs of minority borrowers. The jury came back with an unequivocal yes."

**The New York Times**   http://nyti.ms/299OSMr

N.Y. / REGION

# Emigrant Savings Bank Discriminated Against Minorities, Brooklyn Jury Says

By ALAN FEUER   JUNE 27, 2016

A federal jury in Brooklyn found on Monday that the Emigrant Savings Bank had discriminated against eight minority homeowners by purposefully marketing to them subprime mortgages with what were described as predatory interest rates of as much as 18 percent a year.

In 2011, the homeowners — among them a home health aide, a library worker and a clinician at Rikers Island — filed a lawsuit against the bank in Federal District Court in Brooklyn, claiming that Emigrant Savings had targeted minority customers who had low credit scores with so-called no-income refinancing loans from 2005 to 2009, both before and after the subprime crash. Ending a monthlong trial, the jury's verdict upheld the plaintiffs' claim that the bank had "aggressively" sold the "highly abusive" loans specifically to minority families in violation of the Fair Housing Act, among other state and federal laws.

Six of the plaintiffs were awarded a total of $950,000 in damages in the case. Two others waived their claims after entering into a loan modification agreement with the bank. "Today's verdict was a victory for borrowers seeking redress for Emigrant's discriminatory and predatory lending practices," said Rachel Geballe, a lawyer for Brooklyn Legal Services, which represented the plaintiffs.

One, Edith Saint-Jean, testified that she and her husband had refinanced their home in Brooklyn to pay off more than $30,000 in delinquent bills. Ms. Saint-Jean said that an independent broker had assured her that her monthly payments on the

Emigrant Savings loan would go down within six months, but it did not happen. "They destroyed my life," she said.

Officials for the bank had argued that the mortgages represented less than 5 percent of Emigrant Savings' total assets and often allowed low-income clients, many of them black and Latino, access to the credit market when they had no other options.

"Emigrant loans were a 'lifeline' for these consumers — which is why more than 70 percent of the borrowers in this program succeeded and kept their homes," the bank said in a statement on Monday. After promising to appeal the jury's verdict, the statement added: "Each of the plaintiffs greatly benefited from their Emigrant loans when compared to any gain they would have realized from selling their homes earlier."

### *Correction: June 27, 2016*

*An earlier version of this article misidentified who Edith Saint-Jean had testified assured her that her monthly payments on a loan from Emigrant Savings Bank would go down after six months. It was an independent broker, not Emigrant Savings.*

A version of this article appears in print on June 28, 2016, on page A20 of the New York edition with the headline: Bank Discriminated Against Minorities, Brooklyn Jury Says.

© 2016 The New York Times Company

**The New York Times**   http://nyti.ms/1WE34kt

N.Y. / REGION

# A Benefactor, His Home Loans, and Pain

About New York

By JIM DWYER   JUNE 7, 2016

Among the mighty of New York City, Howard P. Milstein roams many corridors of power. He sits at the head of charities, has been the chairman of the State's Thruway Authority and can find his family's name chiseled onto the walls of hospitals.

He also has run the Emigrant Savings Bank since 2004 — "We saved it," Mr. Milstein said — and expanded a vigorous program that made hundreds of millions of dollars in loans to people with bad credit ratings and no proof that they could pay the money back.

They did, however, have houses that were rich in equity for collateral, and signed documents agreeing that they would pay an interest rate of 18 percent if they fell behind, a circumstance that befell half of Emigrant's subprime borrowers by 2009.

In Mr. Milstein's telling at a federal trial now underway in Brooklyn, such lending was a great service to the community, a source of capital for people who could not otherwise get money. "We were booking more loans and saving more homes for people," he said last month.

Many such loans are widely seen today as part of the toxic financial sludge that accumulated ahead of the global banking and investment crisis of 2008. They are illegal now. But eight families are suing Emigrant and its mortgage subsidiary, claiming that the bank's lending practices were also illegal a decade ago, at the time

their loans were made, primarily because the loans wound up being marketed to minority homeowners.

That is a different, more nuanced issue than whether the loans were wise or contributed to good social hygiene. The bank argues that anyone, of any race, with low credit and high equity in a home would have been eligible for its subprime lending. The color of the hide did not matter, as long as it was otherwise suitable for skinning.

If the financial crisis was one kind of reckoning, the trial of Emigrant is another, micro-version: a vision of an unhealthy, unwise or naïve appetite for debt on the part of some borrowers, and the unseemly drive to provide it that led Mr. Milstein to plow more and more money into a program with a skyrocketing rate of people falling behind.

"They had a high rate of delinquencies, is that right?" asked Reed Colfax, a lawyer representing eight people suing the bank over the loans.

"Well, it depends on what time frame you're talking about," Mr. Milstein replied. "Certainly during the fiscal crisis they had a high rate."

About one loan in four was delinquent around the time Mr. Milstein took over the bank in 2004. By 2009, it was one in two. Under Mr. Milstein, the bank paid its highest incentives and commissions to people who brought in the subprime loans, and nearly tripled the amount of lending, according to records presented at the trial. They were known as Star or Nina loans.

"Well, isn't it true that they always had the highest rate of delinquency of any mortgage program you had in the bank?" Mr. Colfax asked.

"Well, when you think of delinquencies, you have ——" Mr. Milstein began, before being interrupted by Judge Sterling Johnson of the United States District Court.

"Yes or no?" Judge Johnson asked.

"Well, I would say that for the credit scores they were as expected but that may well have been the highest," Mr. Milstein replied. "It was a very small — the smallest of our programs."

Judge Johnson apparently saw that as a nonanswer. "Strike that from the record," the judge said, and Mr. Milstein eventually conceded that it did have the highest rate. Nevertheless, documents showed that the delinquencies presented little risk because the homes were so valuable.

The borrowers — among them a home health aide, a clinic worker at Rikers Island and a library employee — described financial binds for which the subprime Emigrant loans seemed a way out. They testified they did not realize they were signing up for 18 percent interest rates after being late on payments for a month or two. Like Mr. Milstein, they resisted answering straightforward questions such as whether they had signed certain forms disclosing their perils.

Having fallen behind by more than $30,000 on water and gas bills, Edith St. Jean testified, she and her husband found a broker who set them up with an Emigrant mortgage and promised that the refinancing would yield enough cash to pay all their old bills and increase their monthly payment by only $500. At the closing, she said, she discovered it would be twice their previous monthly payment, but was assured of a lower payment in six months. It never came, she said. "They destroyed my life," she said.

An Emigrant lawyer, Keisha Ann Gray, said that Ms. St. Jean and all the borrowers were getting choices. "And as an adult," she said, "who better to know how much you can afford than you?"

### Correction: June 11, 2016

A headline on Wednesday for the About New York column, about a lawsuit over subprime loans at Emigrant Savings Bank, referred incorrectly to those loans in the context of the bank's history. The assertion by Howard Milstein, quoted in the column, that his family "saved" Emigrant referred to the family's acquisition of the bank in the 1980s; it is not the case that the subprime loans, from the 2000s, "helped save" the bank.

**The New York Times**   http://nyti.ms/1WE34kt

N.Y. / REGION

# A Benefactor, His Home Loans, and Pain

About New York

By JIM DWYER   JUNE 7, 2016

Among the mighty of New York City, Howard P. Milstein roams many corridors of power. He sits at the head of charities, has been the chairman of the State's Thruway Authority and can find his family's name chiseled onto the walls of hospitals.

He also has run the Emigrant Savings Bank since 2004 — "We saved it," Mr. Milstein said — and expanded a vigorous program that made hundreds of millions of dollars in loans to people with bad credit ratings and no proof that they could pay the money back.

They did, however, have houses that were rich in equity for collateral, and signed documents agreeing that they would pay an interest rate of 18 percent if they fell behind, a circumstance that befell half of Emigrant's subprime borrowers by 2009.

In Mr. Milstein's telling at a federal trial now underway in Brooklyn, such lending was a great service to the community, a source of capital for people who could not otherwise get money. "We were booking more loans and saving more homes for people," he said last month.

Many such loans are widely seen today as part of the toxic financial sludge that accumulated ahead of the global banking and investment crisis of 2008. They are illegal now. But eight families are suing Emigrant and its mortgage subsidiary, claiming that the bank's lending practices were also illegal a decade ago, at the time

their loans were made, primarily because the loans wound up being marketed to minority homeowners.

That is a different, more nuanced issue than whether the loans were wise or contributed to good social hygiene. The bank argues that anyone, of any race, with low credit and high equity in a home would have been eligible for its subprime lending. The color of the hide did not matter, as long as it was otherwise suitable for skinning.

If the financial crisis was one kind of reckoning, the trial of Emigrant is another, micro-version: a vision of an unhealthy, unwise or naïve appetite for debt on the part of some borrowers, and the unseemly drive to provide it that led Mr. Milstein to plow more and more money into a program with a skyrocketing rate of people falling behind.

"They had a high rate of delinquencies, is that right?" asked Reed Colfax, a lawyer representing eight people suing the bank over the loans.

"Well, it depends on what time frame you're talking about," Mr. Milstein replied. "Certainly during the fiscal crisis they had a high rate."

About one loan in four was delinquent around the time Mr. Milstein took over the bank in 2004. By 2009, it was one in two. Under Mr. Milstein, the bank paid its highest incentives and commissions to people who brought in the subprime loans, and nearly tripled the amount of lending, according to records presented at the trial. They were known as Star or Nina loans.

"Well, isn't it true that they always had the highest rate of delinquency of any mortgage program you had in the bank?" Mr. Colfax asked.

"Well, when you think of delinquencies, you have ——" Mr. Milstein began, before being interrupted by Judge Sterling Johnson of the United States District Court.

"Yes or no?" Judge Johnson asked.

"Well, I would say that for the credit scores they were as expected but that may well have been the highest," Mr. Milstein replied. "It was a very small — the smallest of our programs."

Judge Johnson apparently saw that as a nonanswer. "Strike that from the record," the judge said, and Mr. Milstein eventually conceded that it did have the highest rate. Nevertheless, documents showed that the delinquencies presented little risk because the homes were so valuable.

The borrowers — among them a home health aide, a clinic worker at Rikers Island and a library employee — described financial binds for which the subprime Emigrant loans seemed a way out. They testified they did not realize they were signing up for 18 percent interest rates after being late on payments for a month or two. Like Mr. Milstein, they resisted answering straightforward questions such as whether they had signed certain forms disclosing their perils.

Having fallen behind by more than $30,000 on water and gas bills, Edith St. Jean testified, she and her husband found a broker who set them up with an Emigrant mortgage and promised that the refinancing would yield enough cash to pay all their old bills and increase their monthly payment by only $500. At the closing, she said, she discovered it would be twice their previous monthly payment, but was assured of a lower payment in six months. It never came, she said. "They destroyed my life," she said.

An Emigrant lawyer, Keisha Ann Gray, said that Ms. St. Jean and all the borrowers were getting choices. "And as an adult," she said, "who better to know how much you can afford than you?"

### *Correction: June 11, 2016*
A headline on Wednesday for the About New York column, about a lawsuit over subprime loans at Emigrant Savings Bank, referred incorrectly to those loans in the context of the bank's history. The assertion by Howard Milstein, quoted in the column, that his family "saved" Emigrant referred to the family's acquisition of the bank in the 1980s; it is not the case that the subprime loans, from the 2000s, "helped save" the bank.

**The New York Times**   http://nyti.ms/1WE34kt

N.Y. / REGION

# A Benefactor, His Home Loans, and Pain

About New York

By JIM DWYER   JUNE 7, 2016

Among the mighty of New York City, Howard P. Milstein roams many corridors of power. He sits at the head of charities, has been the chairman of the State's Thruway Authority and can find his family's name chiseled onto the walls of hospitals.

He also has run the Emigrant Savings Bank since 2004 — "We saved it," Mr. Milstein said — and expanded a vigorous program that made hundreds of millions of dollars in loans to people with bad credit ratings and no proof that they could pay the money back.

They did, however, have houses that were rich in equity for collateral, and signed documents agreeing that they would pay an interest rate of 18 percent if they fell behind, a circumstance that befell half of Emigrant's subprime borrowers by 2009.

In Mr. Milstein's telling at a federal trial now underway in Brooklyn, such lending was a great service to the community, a source of capital for people who could not otherwise get money. "We were booking more loans and saving more homes for people," he said last month.

Many such loans are widely seen today as part of the toxic financial sludge that accumulated ahead of the global banking and investment crisis of 2008. They are illegal now. But eight families are suing Emigrant and its mortgage subsidiary, claiming that the bank's lending practices were also illegal a decade ago, at the time

their loans were made, primarily because the loans wound up being marketed to minority homeowners.

That is a different, more nuanced issue than whether the loans were wise or contributed to good social hygiene. The bank argues that anyone, of any race, with low credit and high equity in a home would have been eligible for its subprime lending. The color of the hide did not matter, as long as it was otherwise suitable for skinning.

If the financial crisis was one kind of reckoning, the trial of Emigrant is another, micro-version: a vision of an unhealthy, unwise or naïve appetite for debt on the part of some borrowers, and the unseemly drive to provide it that led Mr. Milstein to plow more and more money into a program with a skyrocketing rate of people falling behind.

"They had a high rate of delinquencies, is that right?" asked Reed Colfax, a lawyer representing eight people suing the bank over the loans.

"Well, it depends on what time frame you're talking about," Mr. Milstein replied. "Certainly during the fiscal crisis they had a high rate."

About one loan in four was delinquent around the time Mr. Milstein took over the bank in 2004. By 2009, it was one in two. Under Mr. Milstein, the bank paid its highest incentives and commissions to people who brought in the subprime loans, and nearly tripled the amount of lending, according to records presented at the trial. They were known as Star or Nina loans.

"Well, isn't it true that they always had the highest rate of delinquency of any mortgage program you had in the bank?" Mr. Colfax asked.

"Well, when you think of delinquencies, you have ——" Mr. Milstein began, before being interrupted by Judge Sterling Johnson of the United States District Court.

"Yes or no?" Judge Johnson asked.

"Well, I would say that for the credit scores they were as expected but that may well have been the highest," Mr. Milstein replied. "It was a very small — the smallest of our programs."

Judge Johnson apparently saw that as a nonanswer. "Strike that from the record," the judge said, and Mr. Milstein eventually conceded that it did have the highest rate. Nevertheless, documents showed that the delinquencies presented little risk because the homes were so valuable.

The borrowers — among them a home health aide, a clinic worker at Rikers Island and a library employee — described financial binds for which the subprime Emigrant loans seemed a way out. They testified they did not realize they were signing up for 18 percent interest rates after being late on payments for a month or two. Like Mr. Milstein, they resisted answering straightforward questions such as whether they had signed certain forms disclosing their perils.

Having fallen behind by more than $30,000 on water and gas bills, Edith St. Jean testified, she and her husband found a broker who set them up with an Emigrant mortgage and promised that the refinancing would yield enough cash to pay all their old bills and increase their monthly payment by only $500. At the closing, she said, she discovered it would be twice their previous monthly payment, but was assured of a lower payment in six months. It never came, she said. "They destroyed my life," she said.

An Emigrant lawyer, Keisha Ann Gray, said that Ms. St. Jean and all the borrowers were getting choices. "And as an adult," she said, "who better to know how much you can afford than you?"

### *Correction: June 11, 2016*
A headline on Wednesday for the About New York column, about a lawsuit over subprime loans at Emigrant Savings Bank, referred incorrectly to those loans in the context of the bank's history. The assertion by Howard Milstein, quoted in the column, that his family "saved" Emigrant referred to the family's acquisition of the bank in the 1980s; it is not the case that the subprime loans, from the 2000s, "helped save" the bank.

# Exhibit - B

1. Based upon the forensic report, Worrell paid $13,750 as a brokerage fee to Emigrant who claimed to be the "originator" and who as named on the note as Payee. Emigrant was also named mortgagee on the mortgage. This is consistent and corroborative with my expert opinion that no loan contract was ever consummated.
2. The elements of an enforceable loan contract are as follows:
    1. Offer by Party A
    2. Acceptance of offer by party B
    3. Consideration and execution
    4. Intent to be bound by the contract.
3. Worrell intended to be bound by a loan contract with a party who had offered to loan him money and who actually did loan him the money. No intent or acceptance can be construed if Party A did not ever intend to fund the loan. Emigrant was either a lender as one might presume from the note and mortgage and "closing" documentation or it was the broker for the transaction as shown on the settlement statement.
4. As stated in my expert opinion and affidavit, all available evidence corroborates the opinion that Emigrant was a broker and not a lender. Hence no loan contract was formed.
5. The absence of any assertion that any of the parties in the chain of paper relied upon for the foreclosure of the property is clear corroboration that the parties themselves know that no actual transaction was ever conducted or completed by any of them and that the paper they are using for foreclosure were fabricated and/or false and probably forged.
6. The fact that Worrell signed documents under the erroneous and reasonable belief that Emigrant was loaning money to him is reason enough to say that the "closing Documents"
    1.
        1. Should never have been released
        2. Should have been destroyed
        3. Should never have been recorded (see applicable Statutes on uttering and recording a false instrument)
        4. Provided no basis on which one can presume that a loan contract was consummated between Worrell and emigrant
        5. Undermine any claim that Emigrant could convey an interest in a loan it never owned
        6. Undermine any authority asserted by Ocwen that it is or was authorized to administer the Worrell loan

    7. Undermine any claims by any other party claiming an interest in the loan where such claims arise from a chain of paper originating with Emigrant.

7. Therefore, all actions undertaken by anyone in connection with the title to the Worrell property are in my opinion void as per the relevant statutes.

8. There is no applicable statute of limitations on title. Worrell owned the property and all attempts and contrivances to take the property were void acts based upon assertions that were and remain untrue on their face.

9. The fact that Worrell is and was in the service of the U.S. armed forces, adds evidence of bad intent and lack of good faith on the part of Ocwen and any other party claiming any rights to enforcement of performance under the provisions of the note or any property rights or collateral rights under the terms of the mortgage. Both the mortgage and note are void.

10.     Florida Statutes include a provision in which the legislature asserts that in a foreclosure action, the owner of the property is not entitled to recover the property or the title after a foreclosure sale. If any state or local law asserts the same type of "law," it is completely unconstitutional in that it puts the burden on the property owner to assert the status quo — i.e., that Worrell owns the property.

11.     The fact that state or bankruptcy courts were led to the erroneous conclusion that the property was subject to foreclosure is not a valid basis to deprive Worrell of his title to property that was vested under the laws of the jurisdiction in which the property is located.

12.     Therefore, it is my opinion that Worrell is still the owner of the property and that the property is unencumbered by the recording of a void mortgage.

Regards,
Neil F Garfield

As I do not represent you I am forced to advise you to defer to the opinion of whatever lawyer you choose and not to apply what is contained in this email on your own.

NO CHARGE: But donations to the living lies blog are always welcome. www.livinglies.wordpress.com